# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CHRISTINE MADISON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Misc. Action No. 07-289 (RMC)** |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Christine Madison served as a juror on a capital case in federal district court in Washington, D.C. from February 7 through June 6, 2007. When she returned to her job at the District of Columbia State Education Office, she was informed that her 13-month employment contract would not be extended or renewed. Despite the shifting defenses put forth by D.C., the facts show that Ms. Madison was separated from employment because she served as a federal juror, in apparent violation of the Jury System Improvements Act, 28 U.S.C. § 1875 (the "Juror Act"). Notwithstanding this factual conclusion, a legal question remains as to whether, under these particular circumstances, Ms. Madison qualified as a "permanent" employee and thus enjoyed the protections of the Juror Act. The Court holds that she did so qualify.

## I. FACTS

Ms. Madison was employed full-time as a Staff Assistant in the Operations Department of the District of Columbia State Education Office ("SEO")[1] from May 15, 2006 through

---

[1] This Office became the District of Columbia Office of State Superintendent of Education ("OSSE"), as of October 1, 2007. *See* Tr. I, 10:8-18. It is organizationally part of the Executive Office of the Mayor. The Court uses the title and initials in effect at the time of the relevant events.

June 14, 2007.  Tr. I, 12:11-12; 15:11-12; 18:16-20; 43:13-15; Pl.'s Exs. 8, 10 & 11.[2]  She had

previously served for approximately seventeen (17) years as an employee of the District at D.C.

General Hospital.  Tr. I, 10:23 - 11:7; Pl.'s Ex. 10.  At the time of separation from SEO, she was

approximately 60 years old.  *See* Tr. I, 66:16-17.

 Dr. JoAnn Smoak, then-Director of Operations at SEO, hired Ms. Madison at a Grade

9 salary level, pursuant to a 13-month term appointment.  Tr. I, 14:17 - 15:12; 88:1-2; Pl.'s Ex. 10.[3]

Former Mayor Anthony Williams instituted these "NTE"[4] appointments for employees in the

Executive Office of the Mayor ("EOM") in order to create "at will" status for EOM employees

without civil service protections.  *See* Tr. I, 198:9-24.  At Ms. Madison's job interview, Dr. Smoak

explained to Ms. Madison that most SEO employees held term appointments and that it was very

rare for an employee not to have their term extended, although there was no guarantee.  Tr. I, 14:17 -

15:2; 71:11-13; 95:6-23.  Ms. Madison was hired to replace Staff Assistant Marsha Proctor, who had

transferred in April 2006 to Support Services for the EOM.  Stip. ¶ 8.c.  Like Ms. Madison, Ms.

Proctor had been working at SEO at Grade 9 under a 13-month term appointment.  Tr. I, 94:7-10;

Tr. II, 5:16-17, 24-25; 6:1-13; Stip. ¶ 8.b.

 During Ms. Madison's employment with SEO, five other employees (aside from Dr.

Smoak) worked in SEO Operations.  Tr. I, 19:18 - 21:9; Stip. ¶¶ 3-7.  Four of the five were hired

generally around the same time as Ms. Madison and pursuant to 13-month term appointments.  Stip.

---

 [2] Trial was conducted on July 15 and 16, 2008.  References are to Tr. I and Tr. II for each
day's trial proceedings, followed by a page number and line number(s).

 [3] As of the trial, Dr. Smoak had become the Chief Operating Officer of the D.C.
Department of Health.

 [4] NTE stands for "Not-to-Exceed."

¶¶ 3.a., 4.a., 6.a., 7.a.  The fifth person was hired in 2003 pursuant to a four-year term appointment.

Tr. I, 97:1-11; Pl.'s Ex. 14A.[5]  Specifically:

- Bachir Kabbara was a Database Manager who had been appointed to a four-year term appointment, effective May 18, 2003, with an NTE date of May 13, 2007.  Tr. I, 97:1-11; Pl.'s Ex. 14A.

- Diane Scroggins was a Program Analyst who had been hired into SEO Operations by Dr. Smoak with a 13-month appointment, effective February 18, 2006 and an NTE date of March 18, 2007.  Tr. I, 97:12-19; Stip. ¶ 4.a.; Pl.'s Ex. 13A.

- Anthonisha Felton was a Staff Assistant, hired by Dr. Smoak sometime around May 2006 pursuant to a 13-month term.  Tr. I, 97:23-25; 98:1-7; 99:13-19; 101:8-24; Stip. ¶ 6a; Pl.'s Ex. 15A.

- Mutinda Parris was hired by Dr. Smoak into the position of Management Analyst, effective June 12, 2006, with an NTE date of July 11, 2007.  Stip. ¶ 3.a.; Pl.'s Ex. 12A.

- Ronald Pitts was hired by Dr. Smoak as an Information Technology Specialist/Data Management, effective October 2, 2006, with an NTE date of November 1, 2007.  Tr. I, 103:15-18; Stip. ¶ 7.a.; Pl.'s Ex. 16A.

Dr. Smoak directly supervised this group.  Tr. I, 22:1-4; 86:3-4.

Ms. Madison's salary at hire with SEO was at a Grade 9/Step 1 level, or $34,832/year.

Tr. I, 19:14-15; Pl.'s Ex. 10.  She thereafter received one step increase and one parity-pay increase.

Tr. I, 63:25 - 65:4.  When separated from employment by Dr. Smoak, her annual salary was $41,901.

Tr. I, 65:13-14; Pl.'s Ex. 11.  While employed, she received full employment benefits, including life

insurance, annual and sick leave, and credit towards D.C. retirement benefits to add to her previous

---

[5]  In court filings in this case, Dr. Smoak initially stated that all of these five employees "had been there at least one year" prior to Ms. Madison's hire in May 2006, "*i.e.*, there were no other employees hired at or about the same time as Ms. Madison."  *See* Def.'s Opp'n to Pl.'s Mot. for Order to Show Cause at 2, Smoak Decl. ¶ 6 [Dkt. # 6]; *see also* Answer ¶ 7 [Dkt. # 8].  As stipulated later by Defendant District of Columbia, and established at trial, these statements were completely wrong, as were other alleged facts declared by Dr. Smoak.

17 years of D.C. service.  Tr. I, 65:15 - 66:23; Pl.'s Exs. 10 & 11.

Ms. Madison's job responsibilities covered general administrative duties, such as ordering supplies, distributing mail, filing, facilities management, petty cash, coordinating approval and payment of employee cell phone bills, and payroll.  Tr. I, 15:13 - 18:2.  Her payroll responsibilities, characterized by Dr. Smoak as her "biggest" and "most critical" responsibility, Tr. I, 142:10-14, included collecting time and attendance records and related information for all SEO employees and processing them so that employees could be timely paid.  Tr. I, 17:19 - 18:4.

Dr. Smoak informally evaluated Ms. Madison's performance in late 2006.  Tr. I, 23:7-13.  During their discussion, Dr. Smoak noted strengths and areas for improvement.  Tr. I, 25:16-17; 26:2-3, 7-10.  Ms. Madison recalled that Dr. Smoak told her that she was doing very well with her time and attendance responsibilities; that she was getting along well with co-workers; that her handling of the mail was efficient and timely; and that she did well in taking care of filing.  Tr. I, 25:20-24.  Dr. Smoak testified that Ms. Madison was "really pretty efficient" with her payroll responsibilities. Tr. I, 194:5; *see also* Tr. I, 108:17-24.  During the evaluation, Dr. Smoak told Ms. Madison that she needed to become more prompt in processing cell phone bills and she suggested that Ms. Madison take some in-service employee training courses offered through the D.C. Center for Workforce Development.  Tr. I, 25:25 - 26:10; 74:14-15.  Ms. Madison took one course recommended by Dr. Smoak — Managing Multiple Projects, Objectives, and Deadlines — before she was summoned for jury duty.  Tr. I, 32:3-11; Pl.'s Ex. 4.[6]

During her jury service, Ms. Madison sometimes worked late or came in on a

---

[6]  Ms. Madison had previously taken other courses at the Center for Workforce Development, both at Dr. Smoak's suggestion and on her own initiative.  Tr. I, 27:22 - 29:18; Pl.'s Ex. 5.

Saturday to work.  Tr. I, 153:12-19; 154:15-16.  Dr. Smoak characterized her willingness to do so, without extra pay, as "above and beyond" and something that Dr. Smoak "really appreciated."  Tr. I, 153:17-18.

Nonetheless, Dr. Smoak testified at trial that Ms. Madison's "overall performance other than in the area of time and attendance was not generally good," Tr. I, 110:11-12, and that she would not characterize Ms. Madison as a satisfactory employee.  Tr. I, 119:14-16.  Dr. Smoak testified that there were "intermittent problems" with Ms. Madison's work performance, Tr. I, 110:8, and that she had difficulty "keeping up with things and getting things in on time," Tr. I, 118:1-2; she asserted that Ms. Madison exhibited a lack of team work, Tr. I, 191:19 - 192:2; and that she had once erred by ordering the wrong kind of paper for SEO.  Tr. I, 194:14 - 195:10.  Finally, Dr. Smoak noted that the Chief Financial Officer had discovered a positive credit in the petty cash account that might have been attributed to Ms. Madison when she was handling petty cash.  Tr. I, 192:23 - 193:9.[7] There are no written records of the informal evaluation or any other contemporaneous records concerning Ms. Madison's performance.

During the time of Ms. Madison's jury service, the SEO was preparing for a huge transition in education oversight in the District of Columbia.  The new Mayor, Adrian Fenty, was

---

[7] When queried by counsel for D.C., Dr. Smoak remembered other flaws with Ms. Madison's performance:

> [S]he was not responsive.  My biggest problem with Christine was that I couldn't get anything out of her, and if I did it was always late.  Not just a little bit late.  Not incidentally late, but good and late. . . .

> I got that report [on employee cell phone usage] one time in six months, and that was symptomatic of just I couldn't get things out of her.

Tr. I, 189:1-15, 21-22.

readying to assume responsibility for all public schools on October 1, 2007, with his authority delegated to the SEO and Schools Chancellor Michelle Rhee.  Tr. I, 34:23 - 35:6; 79:16 - 84:5; Tr. II, 43:2 - 44:7.

Ms. Madison received this Court's summons in December 2006 or January 2007, advising that the trial might last as long as six months.  She promptly provided a copy to Dr. Smoak. Tr. I, 33:14-18; 123:9-13.  While both women agree that they had various conversations about Ms. Madison's jury service, Tr. I, 33:17-19; 35:20 - 36:4; 124:6-9, they remember those conversations differently.  Ms. Madison testified that when she first handed the summons to Dr. Smoak, Dr. Smoak mentioned the pending transition and said, "Four to six months?  Well, Deborah [Gist, State Superintendent of Education] won't be able to use you."  Tr. I, 33:18-19.  Ms. Madison testified that she responded by stating that she did not have any control over whether she would be selected.  Tr. I, 35:16-19.  Although Dr. Smoak remembers that Ms. Madison promptly showed her the jury summons, "nothing sticks out in [her] mind" about their first conversation concerning it.  Tr. I, 121:10-18; 123:9-17.

However, Dr. Smoak does remember that at some point she told Ms. Madison how much Dr. Smoak had enjoyed a period serving on a grand jury.  Tr. I, 127:5-10.  Dr. Smoak "absolutely" does not recall any conversation with Ms. Madison about Ms. Madison's selection as a trial juror.  Tr. I, 132:15-16; Tr. I, 23-25.  Admitting that losing one of her five staff members at a busy transition time "wouldn't be good news," Tr. I, 125:25, Dr. Smoak testified nonetheless that she had had "no reaction to the fact that [Ms. Madison] was selected" for jury duty.  Tr. I, 131:25 - 132:1.

Ms. Madison testified that in subsequent conversations Dr. Smoak gave her advice

on how to avoid jury service.  Tr. I, 36:20-23.  She recounted how Dr. Smoak told her to tell the

court that Ms. Madison believed the defendant was guilty because he would not be on trial if he were

innocent.  Tr. I, 36:24 - 37:3.  Ms. Madison testified that she responded that being on trial does not

mean a person is guilty and that, from her past experiences, it is not easy to be excused from jury

service.  Tr. I, 37:5 - 38:2.

Despite "absolutely" not recalling any conversation or anything particular about

discussions of Ms. Madison's jury service, Dr. Smoak testified that she *is* "absolutely" certain she

did not counsel Ms. Madison on how to avoid jury service.  Tr. I, 126:8-10; 128:6-19.  Dr. Smoak

acknowledged that she had heard of someone successfully telling a court that the person going to

trial was guilty in order to avoid jury duty.  Tr. I, 128:20-25.

Ms. Madison was selected for the jury after four weeks of jury selection (though Ms.

Madison attended only two of those days).  Trial began on February 7, 2007.  During the trial phase,

jurors were required to report for trial four days a week, Mondays through Thursdays.  Tr. I, 41:4-9;

Pl.'s Exs. 6 & 7.  Once the death-penalty and deliberation phases began in May 2007, jurors were

required to report for duty five days a week, Mondays through Fridays.  Tr. I, 41:10-15; Pl.'s Exs.

6 & 7.  With a few exceptions for annual or sick leave, Ms. Madison reported to work at SEO on all

of the days that she did not have jury duty.  Tr. I, 41:18-25; Pl.'s Ex. 6.

In theory, Dr. Smoak divided Ms. Madison's workload among her co-workers, but

during the first weeks of trial when Ms. Madison returned to work on Fridays, she discovered that

they had not completely done her work.  Tr. I, 44:12-18.  For example, Ms. Felton was holding all

of the petty-cash requests until Fridays when Ms. Madison returned to the office.  Tr. I, 44:19 - 45:2.

When Ms. Madison asked Mr. Pitts why he was not handling cell phone bills, he responded via

email, asking "Please tell me when you think I was assigned this task and by whom?"  Tr. I, 45:21-24; Pl.'s Ex. 31.  The bulk of time and attendance work was often left for Ms. Madison, although Mr. Parris had been assigned to take over those tasks.  Tr. I, 45:3-9.  These gaps caused Ms. Madison to work through her lunch break, past 5:00 p.m., and occasionally on Saturday in an effort to catch up.  Tr. I, 47:15 - 48:22.

Ms. Madison's testimony in this regard was corroborated by other employees.  Ms. Proctor, who held Ms. Madison's position before and after Ms. Madison's SEO employment, testified that she took over payroll from Mr. Parris when she was detailed back to SEO in May 2007, because "he had so much on his hands, he couldn't really keep up with it."  Tr. II, 9:17-21.  Ms. Proctor was clear that payroll took three days to process.  Tr. II, 20:14-16.  She also testified that SEO employees were paid every two weeks and, on the weeks in which employees did not receive paychecks, time and attendance, *i.e.* payroll, processing had to be completed by Friday.  Tr. II, 21:11 - 22:1.  Likewise, Mr. Parris testified that payroll had to be completed by close-of-business on Fridays.  Tr. II, 48:12-19.  He further testified that, while he helped Ms. Madison with her duties during her jury service, whatever was "left over on Fridays," he left for her to do "because she was there and that was her responsibility."  Tr. II, 34:2-25.[8]  Contrary to this testimony, Dr. Smoak testified that she "couldn't see how" there was any neglect of Ms. Madison's time and attendance duties while she was on jury duty primarily because payroll had to be completed by close-of-business on Thursdays.  Tr. I, 188:12-20.

Ms. Madison reported that her co-workers appeared to resent her absence during the

---

[8]  This testimony belies Dr. Smoak's insistence that Ms. Madison was not a "team player" because Ms. Madison distinguished between her assigned work and that of her co-workers.

trial because of their increased work loads.  Tr. I, 54:25 - 55:2.  Before the trial, she had a friendly relationship with all of them.  Tr. I, 54:17-20.  She attributed her sense that they resented her to the fact that they were not doing her work during her absence, but saving it for her on the one day she could work.  Tr. I, 55:3-6.  They also constantly asked her when she would be returning to work and if the trial were over yet.  Tr. I, 55:6-8.

On one Friday when Ms. Madison was at work, Mr. Parris and Mses. Scroggins and Felton were around her desk engaged in conversation.  They were discussing how they had been told by Dr. Smoak that their positions were going to be advertised and they would need to re-apply for their jobs. Tr. I, 55:16-19.  Dr. Smoak never gave any such instruction to Ms. Madison.  Tr. I, 55:20-22.

During Ms. Madison's jury service in April 2007, Dr. Smoak arranged to have Ms. Proctor detailed from Support Services back to SEO Operations to resume performing the job she had held before Ms. Madison was hired.  Tr. I, 137:10-20, 148:19-23; Tr. II, 14:14-19.  On Tuesday, May 1, 2007, Dr. Smoak announced to the staff that Ms. Proctor would be returning to Operations on the following Monday, May 7, 2007.  Tr. I, 141:4-10; Pl.'s Ex. 29.  No notice was provided to Ms. Madison.  Then, on Friday, May 4, 2007, after Ms. Proctor had returned on detail to SEO, Dr. Smoak informed Mr. Parris and others at SEO that she did not intend to renew Ms. Madison's term appointment.  *See* Pl.'s Ex. 19.  Again, Ms. Madison was not informed.  Tr. I, 56:6-19.

Meanwhile, Ms. Proctor was assigned to work at Ms. Madison's desk and to take over Ms. Madison's duties.  Tr. I, 51:2-6; Tr. II, 16:2-7; 17:12-14.  Ms. Madison learned of this development when she came to work on Friday and discovered Ms. Proctor working at her desk. Tr. I, 50:11-20.  Dr. Smoak provided no guidance to Ms. Madison as to how to divvy up the work

between her and Ms. Proctor so Ms. Madison could only volunteer to help with various tasks during the time she was at work.  Tr. I, 50:21-23; 51:5-24.

On Friday, May 25, 2007, Dr. Smoak called Ms. Madison into her office, handed her a letter of separation, Pl.'s Ex. 8, and informed her that her employment would not be extended beyond her NTE date of June 14, 2007.  Tr. I, 56:17-19.  According to Ms. Madison's testimony, Dr. Smoak told her that the merger of SEO with the D.C. Public Schools made things hectic at SEO and that Ms. Madison would not be able to keep up with her co-workers or contribute at that time.  Tr. I, 57:8-14.  Ms. Madison told Dr. Smoak that the jury was in deliberations and would be finished fairly soon so that she would soon return to work full-time.  Tr. I, 57:22 - 58:6.  Dr. Smoak denies telling Ms. Madison that it was a hectic time at SEO or that she was concerned that Ms. Madison could not keep pace, Tr. I, 165:8-11, and further denies that Ms. Madison's jury service was discussed at all during the May 25, 2007, meeting.  Tr. I, 167:9-18.  Both parties agree, however, that at the end of the conversation, Dr. Smoak agreed to re-think her decision over the weekend and to consider extending Ms. Madison's appointment for three months to allow Ms. Madison to qualify for retirement benefits.  Tr. I, 57:7-17, 91:23 - 92:7; 168:3-9.  Dr. Smoak also agrees with Ms. Madison that she assured Ms. Madison that she would provide a positive recommendation.  Tr. I, 166:23-25.

Later in the day on May 25, Dr. Smoak sent an email to Patricia McCreary at SEO Human Resources, asking, "Would it be possible for me to extend Christine for another 3 months, rather than terminate her outright?"  Tr. I, 87:11-15; Pl.'s Exs. 21 & 22.  Following the Memorial Day weekend, Ms. McCreary responded on May 29, 2007, stating, "yes. [W]ould you like to do that?"  Tr. I, 170:14-23; Pl.'s Exs. 21 & 22.  On May 30, 2007, Zelalem Hill from Ms. McCreary's

office emailed Dr. Smoak and advised her that Ms. Madison's term appointment had been extended through September 15, 2007.  Tr. I, 170:21-23; Pl.'s Exs. 21 & 22.  While Dr. Smoak does not have "any recollection of it, . . . in all honesty, that doesn't mean I didn't say okay, I am going to do this because I did vacillate back and forth about it. . . ."  Tr. I, 171:23-25.  However, on Thursday, May 31, 2007, Dr. Smoak sent an email to Ms. Hill, Mr. Parris and Ms. McCreary stating that "I just want to be absolutely clear that it has been communicated that I WILL NOT extend Christine."  Tr. I, 173:19-21; Pl.'s Ex. 22.  Despite recognizing from the email traffic that Dr. Smoak had met with Ms. Madison on Wednesday, May 30, 2007, Dr. Smoak had no recollection of such a meeting or what was said.  Tr. I, 174:24 - 175:4.

Dr. Smoak personally decided to terminate Ms. Madison's employment.  There was no question of a reduction in staffing levels or the loss of a position.  Tr. I, 175:8 - 176:24.  Dr. Smoak testified that she is "not really totally sure why" she made the termination decision.  Tr. I, 196:24.  Without going into "psychoanalysis," Tr. I, 196:25, Dr. Smoak "determined over that weekend that it wasn't about her not being there [because of the trial].  It was attitudinal, it was cultural," because Ms. Madison would "still [be] compromising the morale of my team, and . . . still [be] talking about this is my piece and that's your piece . . . [a]nd she still would not be able to use basic electronic tools. . . ."  Tr. I, 197:17-23.

On Ms. Madison's last day of employment, she hand-delivered a letter to Director Gist, Dr. Smoak and Ms. McCreary describing in detail her various meetings with Dr. Smoak and asserting that she was not treated properly because she was fired because of her jury duty.  *See* Ex. 9.  Dr. Smoak recalls seeing the letter but she only gave it to the SEO general counsel and neither she, nor anyone else, ever responded.  Tr. I, 175:13; 176:12 - 178:3.

Ms. Madison was the only person on Dr. Smoak's staff who was on jury duty and is the only one of the six whose employment was not continued.  Tr. I, 178:4 - 180:1.

Ms. Proctor returned to SEO on a detail but in July 2007 was hired as a permanent employee into the position previously held by Ms. Madison.  Tr. I, 181:25 - 182:21; 207:1-3; Stip. ¶ 8.f.; Pl.'s Ex. 17G.  Her appointment was effective July 16, 2007.  Tr. I, 182:6-10.  As admitted by Dr. Smoak:

> Q.  So is it not accurate to say that Ms. Proctor came in while Ms. Madison was on her jury duty and came in and took up Ms. Madison's job duties and then stayed on the job after Ms. Madison was separated and basically replaced Ms. Madison in the position?
>
> A. That would not be inaccurate.

Tr. I, 182:22 - 183:2.  This contrasts sharply with Dr. Smoak's earlier declaration, executed on November 13, 2007, in which she stated that when Ms. Madison's contract expired, SEO did not hire anyone to replace her and the work she performed was divided among current employees.  Pl.'s Ex. 26, ¶ 8; Tr. I, 206:21 - 207:3.  Dr. Smoak tried, unsuccessfully, to weave and dance in her testimony to avoid this disparity, among others.  *See* Tr. I, 207:1 - 209:13.  For example, Dr. Smoak testified that her prior declaration — that she requested Ms. Proctor to be brought into SEO and made arrangements for her to be detailed to cover Ms. Madison's work — was "not an accurate statement" because there were many variables that led to Ms. Proctor being detailed.  Tr. I, 207:19 - 208:12. However, Ms. Proctor's testimony corroborated Dr. Smoak's initial statement, not her dancing and weaving.  *See* Tr. II, 17:10-14 ("Q.  But [Ms. Madison] wound up taking over your position? A. [Proctor]. My position, correct. Q.  Then when she was on jury duty you came back and were filling in for her? A. Correct.").

-12-

When Dr. Smoak left OSSE in July 2008, she took Ms. Proctor with her to the D.C. Department of Health.  Tr. II, 14:20-22.

## II.  JUROR ACT

Jury service is both a duty and a right of citizens of the United States.  It is an essential component of our system of justice, and is integral to the protection and preservation of our constitutional freedoms.  "It is true that at times such service is highly inconvenient to employees and employers," *In re Grand Juror Ronnie Webb*, 586 F. Supp. 1480, 1483 (N.D. Ohio 1984), and employers may find it in their commercial interests to convince employees to try to evade jury service or to punish those employees who are summoned to serve.  But the independence of the federal judiciary depends on the participation of jurors, and that independence can be preserved only if the rights of those who are called to serve as jurors are protected.  To that end, Congress passed the Jury System Improvements Act as a means to protect the employment of those summoned to serve on juries in the federal court system.  The legislative history of the Juror Act evinces Congress's purpose:

> This bill would also accord statutory protection to the employment status of federal jurors during the period of jury service.  At the present time, an employer who is hostile to the idea of jury duty, or who believes that the interests of his business outweigh the obligation for jury service imposed by law, may threaten or harass his employees to encourage their avoidance of such service or may even dismiss them from employment if they are required to assume leave status for this purpose.  It is now difficult for the courts to respond effectively to such employer tactics, since instances of coercion or threatened dismissal are frequently not brought to the attention of the Court or are posed in such a manner as to evade effective response by the judge. . . .
>
> The proposed legislation would provide statutory employment protection to federal jurors by adding a new Section 1875 to Title 28

and by giving the District Courts jurisdiction over legal actions by aggrieved employee-jurors to redress their rights.  The enactment of this provision would be desirable in redressing the present disparity of bargaining position between a harassing employer and his employee who is summoned for jury duty in federal court.  It would also place employers on notice as to their legal duty not to interfere with jury service by employees and would offer employees the assurance that their rights in this regard will be protected by law.

H.R. Rep. No. 95-1652, at 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5477, 5480.

The Juror Act provides, in relevant part, that:

(a) No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

(b) Any employer who violates the provisions of this section –

(1) shall be liable for damages for any loss of wages or other benefits suffered by an employee by reason of such violation;

(2) may be enjoined from further violations of this section and ordered to provide other appropriate relief, including but not limited to the reinstatement of any employee discharged by reason of his jury service; and

(3) shall be subject to a civil penalty of not more than $5,000 for each violation as to each employee. . . .

(d)(1) An individual claiming that his employer has violated the provisions of [the Juror Act] may make application to the district court for the district in which such employer maintains a place of business and the court shall, upon finding probable merit in such claim, appoint counsel to represent such individual in any action in the district court necessary to the resolution of such claim. . . .

(2) . . . [t]he court may award a prevailing employee who brings such action by retained counsel a reasonable attorney's fee as part of the costs.  The court may tax a defendant employer, as costs payable to the court, the attorneys fees and expenses incurred on behalf of a prevailing employee, where such costs were expended by the court

-14-

pursuant to paragraph (1) of this subsection. . . .

28 U.S.C. § 1875.

### III.  ANALYSIS

This case presents two questions, one factual and one legal:  (1) did SEO fail and refuse to extend continued employment to Ms. Madison because of her five-month jury service, and (2) did Ms. Madison's employment status render her ineligible for protection by the Juror Act?

### A.  Ms. Madison's Separation from Employment

Ms. Madison was hired by Dr. Smoak in May 2006, provided a generally positive informal review by Dr. Smoak in late 2006, called for jury duty in January 2007, put into jury service from February 7, 2007 through June 6, 2007, and discharged on May 25, 2007, after someone else was detailed into SEO to take over her job.  The Court does not credit the shifting and exceptionally vague testimony provided by Dr. Smoak for the reasons behind this sequence of events.  Ms. Madison's contemporaneous recordation of events is much more credible and ties her loss of employment directly to her lengthy jury service.

Without doubt, during the time of Ms. Madison's employment with SEO, the SEO Operations Department was very busy and its employees frequently felt overwhelmed.  Yet Dr. Smoak would have the Court believe, and find, that she had no particular reaction to notice that Ms. Madison was selected to serve on a jury that could last for six months.  Such testimony is incredible. Even those managers who understand the gravity of jury service and its critical place in our legal system have a right to be annoyed at the loss of an employee for a lengthy period; they just do not have the right to retaliate against the employee as a result.  A cheerful conversation on the joys of serving on a grand jury is much less likely than the one reported by Ms. Madison.  The Court finds,

based on the demeanor and credibility of the witnesses, Dr. Smoak's convenient inability to remember conversations, and the inherent probabilities of the situation, that Dr. Smoak urged Ms. Madison to attempt to avoid jury service by telling the Court that she was convinced the defendant must be guilty because he was charged. Ms. Madison's civic duty was not welcomed by her boss.

Dr. Smoak attempted to explain her termination decision by conjuring up a parade of performance horribles attributable to Ms. Madison. The most questionable is Ms. Madison's alleged lack of team spirit because she allegedly failed to help other employees complete their job duties. A demonstrable lack of "team spirit" was demonstrated by Ms. Madison's co-workers when they assisted the absent Ms. Madison as little as possible in getting her tasks completed during jury service, yet not one complaint can be heard from Dr. Smoak, and Mr. Parris — who candidly admitted dumping work back on Ms. Madison on Fridays "because she was there and that was her responsibility," Tr. II, 34:23-25 — was offered career employment and a promotion.[9]

Equally implausible is Dr. Smoak's testimony that a positive balance in the petty cash account contributed to her decision to terminate Ms. Madison. Interestingly, the District of Columbia failed to provide any evidence of the timing of this event and the circumstances strongly suggest that the Inspector General's audit was performed after Ms. Madison was fired. Without specifics, the Court cannot rely on this alleged failure to underlie Dr. Smoak's decision: Ms.

---

[9] Mr. Parris was never a "permanent" employee. Rather, he has been granted one term appointment after another. He was first hired on June 12, 2006 as a management analyst by Dr. Smoak as a term employee. Tr. II, 30:5-12. That term appointment was extended by Dr. Smoak on July 12, 2007. Tr. II, 38:5 - 41:14. While he also applied to be converted from term to career status and was offered a career appointment, Tr. II, 40:13-14, he ultimately turned down that opportunity and instead accepted another term appointment in the Office of Public Charter School Financing and Support, also part of SEO, in July 2007. Tr. II, 39:2-4; 40:22 - 41:22. At the time of trial in July 2008, Parris was serving on a term appointment. Tr. II, 30:13-14.

Madison handled petty cash from May 2006 to January 2007 and someone else handled it for the months of the trial thereafter, as well as before Ms. Madison's hire in May 2006. There is no evidence to attribute this alleged problem to Ms. Madison. Since any such evidence is peculiarly in the control of D.C., the Court concludes that its absence from the trial record is attributable to the District.[10]

Dr. Smoak complained that Ms. Madison rarely produced timely reports on employee cell phone usage. She also acknowledged, however, that technological and coordination problems with other offices made this a very difficult task to accomplish and that Ms. Madison tried very hard to get it done. Tr. I, 205:17-22 ("Q. Did she not discuss with you the problem she was having in getting the cell phone bills electronically? A. She did. Q. Did she not go elsewhere and try to get somebody to help her get these electronic cell phone bills? A. She did, she did try."). Her complaint that Ms. Madison failed to submit a so-called "front burner report" at each week's staff meeting, and thereby deserved to be discharged, is also inherently suspect. *See* Tr. I, 152:13-25. First, Dr. Smoak's recollection that Ms. Madison failed to produce these reports before her jury service cannot be credited since Dr. Smoak remembers nothing specific about anything important. Second, Dr. Smoak's recollection that she expressed frustration with Ms. Madison about her front

---

[10] Dr. Smoak testified that she sent emails to Ms. Madison detailing some of her performance deficiencies. The emails were requested in discovery and not produced. The Court found that they do not exist and here reiterates that conclusion, not just because they were not produced but also because Dr. Smoak's testimony is found to be not credible in this regard. *See* Tr. I, 113:3-11 (Mr. Feldman: "Your Honor, I would like to request an opportunity to see those e-mails because there has been a lot of back and forth. It's all been very cordial and cooperative, but I get the impression that Mr. Saindon [counsel for D.C.] has been providing us with everything as he has been able to get it and we haven't gotten that. The Court: Well, I will tell you what. Since the e-mails aren't here and they were asked for and not produced in discovery, they don't exist.").

burner reports before jury duty cannot be corroborated because there are no emails.  Third, the one time that Ms. Madison remembers Dr. Smoak commenting negatively on her front burner report was during jury service when it was, perforce, without content because Ms. Madison was in jury service four days a week.  Tr. I, 52:23 - 53:25.

Finally, Dr. Smoak admitted that Ms. Madison performed her time and attendance duties very well, which were the most critical part of her job.  Notably, time and attendance had to be collected and recorded weekly for all SEO employees while payroll was issued on a bi-weekly basis.  Dr. Smoak's efforts to reduce this work from three days/week, including Fridays, to shorter periods was completely contradicted by employee testimony.  In addition, Ms. Proctor's ability to perform this work after her detail back to Operations only followed training in PeopleSoft software, a new software to track the details that Ms. Madison had mastered and with which Ms. Proctor was unfamiliar.  Thus, on the most critical set of tasks of the position, Ms. Proctor was unprepared.

The District of Columbia first defended against this suit by submitting Dr. Smoak's declarations indicating that Ms. Madison's term appointment was allowed to lapse and no one was hired to replace her.  D.C. also declared that no other Operations employees were hired or extended at the time of consideration of Ms. Madison's appointment.  Those defenses very obviously fail to match the facts and are rejected.  They call Dr. Smoak's memory and candor into question.

Dr. Smoak testified that Ms. Madison was not a satisfactory employee but, when asked exactly why she did not extend Ms. Madison's appointment even for three months so that she would qualify for a pension, Dr. Smoak could not say.  Her testimony that Ms. Madison's performance was unsatisfactory was weak and internally contradictory.  Dr. Smoak's inability to provide a legitimate reason for her failure to agree to extend Ms. Madison's appointment is

astonishing. What she did say was that, after thinking about terminating Ms. Madison all weekend, she "determined . . . *that it wasn't about her not being there [because of the trial]*.  It was attitudinal, it was cultural," because Ms. Madison would "still [be] compromising the morale of my team, and . . . still [be] talking about this is my piece and that's your piece."  Tr. I, 197:17-22 (emphasis added). As described above, the alleged "compromising the morale" of the team was unsupported nonsense: "this is my piece and that's your piece" seems to have been a shared attitude.  Rather, Dr. Smoak's slip of the tongue reveals what was at issue: it *was* about Ms. Madison "not being there."

The Court finds that Ms. Madison was discharged by SEO because she served as a juror in the spring of 2007.  That does not end the inquiry, however, because the legal question is now ripe and must also be resolved.

## B.  The "Permanence" of Ms. Madison's SEO Employment

The District of Columbia argues that Ms. Madison fails to make the necessary threshold showing that she was a permanent employee of SEO and, therefore, her complaint must be dismissed.  D.C. relies on the specific terms of the Juror Act: "No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service . . . in any court of the United States."  28 U.S.C. § 1875(a).  Because Ms. Madison was hired on a 13-month term appointment, so the argument goes, she was not a "permanent" employee and does not qualify for coverage or the protections of the statute.

The force of the legal argument cannot be gainsaid except for the particular fact pattern here.  D.C. analogizes "permanent" employee with a "career service" employee, Def.'s Mem. at 5, but that analogy does not work.  Clearly, employees in "at will" employment who can be terminated at any time and employees with similar non-permanent employment arrangements still

qualify for the protections of the Juror Act. *See, e.g.*, *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1519-20, 1526-27 (11th Cir. 1991) (Juror Act applied to produce manager of grocery store); *Shaffer v. ACS Gov't Servs.*, 321 F. Supp. 2d 330, 334-38 (D. Md. 2006) (Juror Act applied to business development director of a company who was an at-will employee); *United States ex rel. Madonia v. Coral Springs P'ship, Ltd.*, 731 F. Supp. 1054, 1055-57 (S.D. Fla. 1990) (Juror Act protected employment of assistant manager at hair salon); *Johnson v. Appliance & T.V. Ctr., Inc.*, No. C-86-601-D, 1987 WL 16942, at *1 (MD.N.C. 1987) (Juror Act protected office clerk of appliance and television retailer); *Jones v. Marriot Corp.*, 609 F. Supp. 577, 578-79 (D.D.C. 1985) (cashier at hotel dining facility was a permanent employee for purposes of protection under the Juror Act); *In re Grand Juror Ronnie Webb*, 586 F. Supp. at 1481-85 (Juror Act protected truck driver of supply company). Just as clearly, former Mayor Williams sought to use term appointments, frequently extended, to avoid granting civil service status to persons hired into the Office of the Mayor. The question is whether term appointments, as used by the Williams Administration, robbed such employees of sufficient "permanence" to destroy their remedy for proven retaliation due to federal jury service.

On the record here, the Court concludes that Ms. Madison deserves the protection of the statute. Although structured as "term" appointments, clearly SEO used these terms for long-term, *i.e.*, permanent employment, such as the four-year appointment for Bachir Kabbara. Only during the term of Ms. Madison's first appointment — when the Inspector General advised that continuous use of term appointments for otherwise-permanent employees was inappropriate — did SEO allow so-called "term" employees to apply for permanent positions rather than just having their terms extended. Certainly at the time Ms. Madison was hired, Dr. Smoak anticipated that her

successful performance would result in an extension of Ms. Madison's "term" appointment, not a civil service "permanent" job. The happenstance that the Williams Administration hired employees on so-called "term" appointments to avoid civil service regulations, fully intending to extend as desired, or to award multi-year "term" appointments, cannot be used to destroy Ms. Madison's protections from retaliation for federal jury service when there is insufficient evidence to support D.C.'s alternative theory that her performance was unsatisfactory. In other words, EOM was using "term" appointments to give it flexibility to discharge and not in expectation that any appointment would actually terminate on an NTE date. "Term" appointees were expected to be permanent in their jobs (until the OIG advice) unless they failed to perform. The evidence of Ms. Madison's alleged "failure" to perform being discredited, the Court finds, on these facts, that she qualified as a "permanent" employee under the Juror Act.

## IV.  CONCLUSION

The Court concludes that Ms. Madison was separated from her employment with the SEO in violation of the Jury System Improvements Act. As a remedy for this violation, Ms. Madison is entitled to: reinstatement to employment with the District of Columbia government in the same or comparable position she would have held had she never been discharged; payment of all wages she would have received had she never been terminated; retroactive restoration of all employee benefits; and an order permanently enjoining the District of Columbia from committing any further Juror Act violations against Ms. Madison. The Court will further order that the District of Columbia reimburse the Court for the payment of the reasonable costs of this action, including

reasonable attorney's fees and costs for Ms. Madison's Court-appointed counsel; and pay a statutory

penalty of $5,000.  A memorializing Order accompanies this Memorandum Opinion.


Date: January 23, 2009                                    /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge